IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2015 Term

**FILED**

**May 22, 2015**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 14-0200

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

RICK BROCK,
Defendant Below, Petitioner

Appeal from the Circuit Court of Wood County
The Honorable Robert A. Waters, Judge
Criminal Action No. 13-F-144

AFFIRMED

Submitted:  April 21, 2015
Filed:  May 22, 2015

Eric K. Powell, Esq.
Powell Law Office
Parkersburg, West Virginia
Attorney for the Petitioner

Patrick Morrisey, Esq.
Attorney General
Derek A. Knopp, Esq.
Assistant Attorney General
Attorneys for the Respondent

CHIEF JUSTICE WORKMAN delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "This Court's standard of review concerning a motion to dismiss an

indictment is, generally, *de novo*."  Syl. Pt. 1, in part, *State v. Grimes*, 226 W. Va. 411, 701

S.E.2d 449 (2009).

2.      "As a general rule, a refusal to give a requested instruction is reviewed

for an abuse of discretion."  Syl. Pt. 1, in part, *State v. Hinkle*, 200 W. Va. 280, 489 S.E.2d

257 (1996).

3.      "A trial court's refusal to give a requested instruction is reversible error

only if:  (1) the instruction is a correct statement of the law; (2) it is not substantially covered

in the charge actually given to the jury; and (3) it concerns an important point in the trial so

that the failure to give it seriously impairs a defendant's ability to effectively present a given

defense."  Syl. Pt. 11, *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994).

4.      "When reviewing a ruling on a motion to suppress, an appellate court

should construe all facts in the light most favorable to the State, as it was the prevailing party

below.  Because of the highly fact-specific nature of a motion to suppress, particular

deference is given to the findings of the circuit court because it had the opportunity to

observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error." Syl. Pt. 1, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996).

5.      "In contrast to a review of the circuit court's factual findings, the ultimate determination as to whether a search or seizure was reasonable under the Fourth Amendment to the United States Constitution and Section 6 of Article III of the West Virginia Constitution is a question of law that is reviewed *de novo*. Similarly, an appellate court reviews *de novo* whether a search warrant was too broad. Thus, a circuit court's denial of a motion to suppress evidence will be affirmed unless it is unsupported by substantial evidence, based on an erroneous interpretation of the law, or based on the entire record, it is clear that a mistake has been made." Syl. Pt. 2, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996).

6.      Pursuant to the United States Supreme Court's decision in *Illinois v. Caballes*, 543 U.S. 405 (2005), as a general rule, a dog sniff of the outside of a vehicle during a lawful traffic stop is not a search within the meaning of the Fourth Amendment to the United States Constitution or article III, section 6 of the West Virginia Constitution.

7.      Following the law established by the United States Supreme Court in

*United States v. Rodriguez*, 135 S.Ct. 1609 (2015), and *Illinois v. Caballes*, 543 U.S. 405 (2005), a police officer may not extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff of the outside of a vehicle.

8.      "The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syl. Pt. 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

9.      "A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution.  The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court.  Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which

the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled." Syl. Pt. 3, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

10.    "In order to sustain a conviction for violation of W. Va. Code § 60A-4-411 (2003), by assembling any chemicals or equipment for the purpose of manufacturing methamphetamine, the State must prove beyond a reasonable doubt that the defendant had actual or constructive possession over the chemicals and/or equipment. In order to establish constructive possession where the defendant is present in a vehicle wherein such materials are found, the State must prove beyond a reasonable doubt that the defendant had knowledge of the presence of the chemicals and/or equipment to be used for the purposes of manufacturing methamphetamine and that such items were subject to the defendant's dominion and control." Syl. Pt. 6, *State v. Cummings*, 220 W. Va. 433, 647 S.E.2d 869 (2007).

Workman, Chief Justice:

This case is before the Court upon the appeal of the Petitioner, Rick Brock, from an order entered on February 20, 2014, sentencing him to serve two to ten years in the West Virginia Penitentiary for operating or attempting to operate a clandestine drug laboratory and one to five years for conspiracy to operate or attempt to operate a clandestine drug laboratory following a jury conviction on both counts. The circuit court ordered the sentences to be served concurrently, but then suspended both to allow the Petitioner to serve a three-year period of probation. On appeal, the Petitioner argues that the trial court erred: 1) in denying his motion to dismiss as both counts one and two in the indictment each attempt to charge the defendant with two crimes in violation of West Virginia Rule of Criminal Procedure 8; 2) in failing to give the entirety of the Petitioner's proposed instruction numbered one; 3) in denying the Petitioner's motion to suppress; 4) in determining that there was sufficient evidence to uphold the convictions; and 5) in allowing expert testimony concerning the dangers and explosiveness of a methamphetamine (also referred to as "meth") lab as the testimony was irrelevant and its probative value was substantially outweighed by its prejudicial effect. Based upon our review of the parties' briefs and oral arguments, the appendix record, and all other matters submitted before the Court, we affirm the decision of the circuit court.

1

## I. Factual and Procedural Background

The Petitioner and his co-defendant, Terry Abbott, were indicted on July 18, 2013, for one count of operating or attempting to operate a clandestine drug laboratory (also referred to as a "drug lab") and one count of conspiracy to operate or attempt to operate a clandestine drug laboratory.[1] According to the evidence at trial, on April 27, 2013, Capt. Woodyard of the Wood County Sheriff's Department was working with a team of officers.[2] Around 1:40 to 1:50 in the morning, Capt. Woodyard began to follow a car that he identified as a Monte Carlo. The officer observed the vehicle travel left of center at least three times; the driver also repeatedly tapped the brakes of the vehicle and caused the vehicle to go right

---

[1]The Petitioner and Mr. Abbott were also tried together. Only the Petitioner's appeal of his conviction is the subject of the instant opinion.

[2]During the suppression hearing, Capt. Woodyard testified that he was a part of a drug enforcement team and he was performing surveillance, in an unmarked car, of a house where controlled meth buys had been made. After 1:00 a.m., Capt. Woodyard saw a white Monte Carlo pull up to the house he was watching and saw at least two passengers in the car. One of the passengers exited the vehicle and entered the house. The vehicle stayed at the house for fifteen to twenty minutes then left and returned within about thirty minutes. On the second trip to the house, the vehicle again had two passengers. The officer was able to identify one of the passengers as the co-defendant, Terry Abbott. Again, one person exited the vehicle, went into the house and remained inside for about fifteen minutes. The individual then left the house, returned to the vehicle and the vehicle then left a second time.

Given the lack of any evidence regarding who was in the house or what was going on inside the house on the morning of April 27, 2013, the trial court found the foregoing testimony concerning events leading up to the vehicle stop inadmissible at trial.

of the fog line.

Because Capt. Woodyard was in plain clothes and driving an unmarked car, he called for a marked car "to make the traffic stop[,] " after observing the erratic driving. West Virginia State Police Trooper C.S. Jackson was working in conjunction with Capt. Woodyard and responded to the call. Capt Woodyard testified that he continued to follow the Monte Carlo until Trooper Jackson arrived. Capt. Woodyard testified that he observed Trooper Jackson turn on his lights and pull over the car; Capt. Woodyard did not stop with Trooper Jackson.

Trooper Jackson testified that Capt. Woodyard informed him about a potential impaired driver and that the vehicle was a Monte Carlo. Trooper Jackson did not independently observe any traffic violations. Trooper Jackson stopped the vehicle based upon the information provided by Capt. Woodyard.[3] The stop was videotaped. The Petitioner was driving the vehicle, while the co-defendant Abbott was in the passenger seat. The trooper asked for the vehicle registration and for the Petitioner's license. The Petitioner produced the registration, but could not produce an identification. The trooper asked the Petitioner to step out of the vehicle. The Petitioner got into his wallet and produced a license; however, it was a revoked Ohio driver's license. Trooper Jackson testified that the

---

[3]There was also another state trooper present at the traffic stop.

3

Petitioner "was acting real nervous. He was fidgety."

The Petitioner had borrowed the vehicle from the owner, Blossom Abbott, the Petitioner's girlfriend. The trooper asked if there was anything illegal in the car, to which the Petitioner answered that he did not believe so. The trooper asked if he could search the car and the Petitioner said no. About six minutes after the stop occurred, the trooper requested a canine unit. At approximately twelve minutes and forty-eight seconds into the video, an officer stated that he thought it may be an active drug lab.

Trooper Jackson testified that the dog alerted him to the presence of drugs on the front passenger-side door of the vehicle. Once the dog detected the presence of drugs, Trooper Jackson opened the passenger door and began to search the vehicle. The trooper stated that he first observed coffee filters and then a soda pop bottle in a blue insulated cooler bag. The pop bottle had sediment in the bottom on the inside. Trooper Jackson testified that "[w]hen I got closer, I then detected a chemical odor[,]" that he recognized as being "indicative of a meth lab." The trooper also "observed a vapor or cloud emitting from that [referring to the bag] which raised extreme caution[,]" as the trooper explained "[i]t is highly explosive if the pressure is exceeded." Trooper Jackson referred to what he had found as "a young pop clandestine laboratory or shake and bake." The trooper also stated that he found a syringe, a cold pack, additional coffee filters, including a used coffee filter with

4

white powder residue, and ammonium nitrate.

Alisha Neil, a forensic chemist with the West Virginia State Police Forensic Laboratory, testified that four pieces of evidence were submitted to the West Virginia State Police Laboratory for analysis. Only two of the four items tested positive for meth including Item 1.1, which consisted of two plastic bags containing white and off-white powder in chunks and coffee filters weighing approximately .12 grams. Evidence identified as Item 2.2, which was a powder residue, also tested positive for meth.

The final witness for the State was Douglas E. Sturm, a police officer with the City of Parkersburg Police Department and a certified instructor on methamphetamine awareness and recognition, who testified as an expert. Officer Sturm testified regarding the "one-bottle method" or "shake and bake method" of making meth. Officer Sturm reviewed the photographs and evidence taken from the vehicle the Petitioner was in at the time of the traffic stop. The officer testified that for "the chemical reaction, everything appears to be there for this bottle. The chemical reaction has already taken place, but it was stopped for one reason or another." The officer later clarified during cross-examination that while the reaction was stopped, "[i]t [referring to the chemical reaction] . . . [did] not appear to be done to me."

The Petitioner and his co-defendant, Terry Abbott, did not testify at trial. Additionally, they did not present any evidence as part of their respective defenses.

On December 12, 2013, following a two-day jury trial, the Petitioner was convicted of operating or attempting to operate a clandestine drug laboratory and conspiracy to operate or attempt to operate a clandestine drug laboratory. These convictions form the basis for the instant appeal.

## II. Standard of Review

The Petitioner has asserted several assignments of error involving various legal principles and differing standards of review. Thus, we will address the applicable standard of review within the discussion section regarding the assigned error.

## III. Discussion

### A. The Indictment

The first issue concerns whether the trial court erred by denying the Petitioner's motion to dismiss the indictment. The Petitioner argues that he was improperly charged with only two crimes – operating or attempting to operate a clandestine drug laboratory as one count and conspiracy to operate or attempt to operate a clandestine laboratory as count two. Instead, he maintains that operating a clandestine drug lab is a separate offense from the

6

crime of attempting to operate a clandestine drug lab.  Likewise, the Petitioner contends that a conspiracy to operate a clandestine lab is a separate offense from a conspiracy to attempt to operate a clandestine lab.

As support for his argument, the Petitioner relies upon Rule 8 of the West Virginia Rules of Criminal Procedure.  Rule 8 requires separate counts for each offense as follows:

> (1) Permissive Joinder. – *Two or more offenses may be charged in the same indictment* or information *in a separate count for each offense* if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character.
>
> (2) Mandatory Joinder. – If two or more offenses are known or should have been known by the exercise of due diligence to the attorney for the state at the time of the commencement of the prosecution and were committed within the same county having jurisdiction and venue of the offenses, *all such offenses upon which the attorney for the state elects to proceed shall be prosecuted by separate counts in a single prosecution if they are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan, whether felonies or misdemeanors or both*. Any offense required by this rule to be prosecuted by a separate count in a single prosecution cannot be subsequently prosecuted unless waived by the defendant.

(Emphasis added).  Under the Petitioner's theory, the indictment violates Rule 8 because there should have been four counts – one for the charge of operating a clandestine lab; one for attempting to operate a clandestine lab; one for conspiracy to operate a clandestine lab; and, one for conspiracy to attempt to operate a clandestine lab.  Instead, there were only two

7

counts in the indictment.

"This Court's standard of review concerning a motion to dismiss an indictment is, generally, *de novo*." Syl. Pt. 1, in part, *State v. Grimes*, 226 W. Va. 411, 701 S.E.2d 449 (2009). Under this standard of review, we examine the first issue before us.

The provisions of West Virginia Code § 60A-4-411 (2014) reveal that the offense with which the Petitioner was charged was not "two or more offenses" as the Petitioner maintains. Rather, a plain reading of the statute evinces that the Legislature set out in West Virginia Code § 60A-4-411 a single crime. To that end, West Virginia Code § 60A-4-411(a) provides:

> Any person who operates or attempts to operate a clandestine drug laboratory[4] is guilty of a felony and, upon conviction, shall be confined in a state correctional facility for not less than two years nor more than ten years or fined not less than five thousand dollars nor more than twenty-five thousand

---

[4]The statute also provides:

> For purposes of this section, a 'clandestine drug laboratory' means any property, real or personal, on or in which a person assembles any chemicals or equipment or combination thereof for the purpose of manufacturing methamphetamine, methylenedioxymethamphetamine or lysergic acid diethylamide in violation of the provisions of section four hundred one of this article.

W. Va. Code § 60A-4-411(b).

dollars, or both.

*Id.* (footnote added). The statute indicates that it is one offense that can be committed in two ways – to operate or to attempt to operate. Thus, contrary to the Petitioner's argument, the statute sets forth a single offense, not two separate offenses.

Moreover, the indictment in this case tracked the language of West Virginia Code § 60A-4-411. As we have previously held,

> [a]n indictment for a statutory offense is sufficient if, in charging the offense, it adopts and follows the language of the statute, or uses substantially equivalent language, and plainly informs the accused of the particular offense charged and enables the court to determine the statute on which the charge is founded.

Syl. Pt. 3, *Pyles v. Boles*, 148 W. Va. 465, 135 S.E.2d 692 (1964).

Likewise, the conspiracy charge, which is contained in a separate count, is a separate offense. This Court held in syllabus point three of *State v. Burd*, 187 W. Va. 415, 419 S.E.2d 676 (1991), that

> '[i]n order for the State to prove a conspiracy under W. Va. Code, 61-10-31(1),[5] it must show that the defendant agreed with others to commit an offense against the State and that some overt act was taken by a member of the conspiracy to effect the object of that conspiracy.' Syl. Pt. 4, *State v. Less*, 170 W.Va.

---

[5]West Virginia Code § 61-10-31 provides that "[i]t shall be unlawful for two or more persons to conspire (1) to commit any offense against the State . . . if . . . one or more of such persons does any act to effect the object of the conspiracy."

9

259, 294 S.E.2d 62 (1981).

(Footnote added).

Having examined the relevant law on this issue, we agree with the trial court's determination that the clandestine drug laboratory statute simply allows the crime to be committed in two different ways, "but it is still one crime, and that's the clear intent of the legislature in using the language of operating or attempting to operate, so there is no violation of Rule 8." Consequently, there was no error in the circuit court's denial of the Petitioner's motion to dismiss.

## B. The Instruction

The next issue raised is whether the circuit court erred in failing to give the entirety of the Petitioner's proposed jury instruction numbered one,[6] which concerned the

---

[6]The instruction given by the trial court contained the first two paragraphs of the Petitioner's proposed instruction. *See* paragraphs one and three of the instruction given by the trial court above. At issue are the following two paragraphs not given by the trial court:

> Therefore, if the jury, and each member of the jury, has a reasonable doubt as to whether the Defendant, Rick Brock, had knowledge of the presence of the chemicals and/or equipment to be used for the purpose of manufacturing methamphetamine, you should find the Defendant, Rick Brock, not guilty of Operating or Attempting to Operate a Clandestine Drug Laboratory.
> In addition, if the jury, and each member of the jury, has

(continued...)

10

burden of proof for actual or constructive possession of a controlled substance. The circuit

court gave the following instruction, rather than the Petitioner's proposed instruction:

> In West Virginia mere physical presence on premises in which a controlled substance is found does not give rise to a presumption of possession of a controlled substance, but is evidence to be considered along with other evidence demonstrating conscious dominion over the controlled substance.
>
> A conviction should not be obtained by piling inference upon inference. An inference is reasonable only if the conclusion flows from logical and probabilistic reasoning. The evidence supporting the conviction must be substantial and do more than raise a suspicion of guilt. To prove constructive possession when there is joint occupancy of a vehicle, the State must present direct or circumstantial evidence to show some connection or nexus individually linking the defendant to the contraband. The State must present some evidence supporting at least a plausible inference that the defendant had knowledge of an access to the contraband.
>
> In order to sustain a conviction for Operating or Attempting to Operate a Clandestine Drug Laboratory by assembling any chemicals or equipment for the purpose of manufacturing methamphetamine, the State must prove beyond a reasonable doubt that the defendant had actual or constructive possession over the chemicals and/or equipment. In order to establish constructive possession where the defendant is present in a vehicle wherein such materials are found, the State must prove beyond a reasonable doubt that the defendant had knowledge of the presence of the chemicals and/or equipment to be used for the purposes of manufacturing methamphetamine and that such items were subject to the defendant's dominion

---

[6](...continued)
> a reasonable doubt as to whether the Defendant, Rick Brock, exercised dominion and control over the chemicals and/or equipment, then you should find the Defendant, Rick Brock, not guilty. *State v. Cummings*, 647 S. E.2d 869 (W. Va. 2007).

11

and control.

The Petitioner argues that it was error for the circuit court not to include the last two paragraphs of his proposed instruction, which consisted of instructing the jury that if they have a reasonable doubt as to whether the defendant had knowledge or exercised dominion and control over the chemicals and/or equipment, then they should find him not guilty. The Respondent argues that even though the Petitioner's proposed instruction is "substantively correct," the trial court's instructions fully covered the State's burden to prove constructive possession, as well as the burden to prove the case beyond a reasonable doubt.

"As a general rule, a refusal to give a requested instruction is reviewed for an abuse of discretion." Syl. Pt. 1, in part, *State v. Hinkle*, 200 W. Va. 280, 489 S.E.2d 257 (1996). Moreover, "[w]hen assessing whether the trial court properly exercised that discretion, a reviewing court must examine the instructions as a whole to determine if they sufficiently cover the issues in the case and focus on the facts presented by the evidence." *Id.* at 285, 489 S.E.2d at 262. We also held in syllabus point eleven of *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994), that

> [a] trial court's refusal to give a requested instruction is reversible error only if: (1) the instruction is a correct statement of the law; (2) it is not substantially covered in the charge actually given to the jury; and (3) it concerns an important point in the trial so that the failure to give it seriously impairs a defendant's ability to effectively present a given defense.

12

When the jury instructions given by the trial court in the instant case are examined in their entirety, the jury was properly instructed regarding the burden of proof being on the State to prove guilt beyond a reasonable doubt in both the standard and constructive possession instructions. The standard instructions also covered the law that the defendant is presumed innocent and that the burden of proof never shifted to the defendant. Consequently, the portion of the Petitioner's proposed instruction that the trial court did not include was cumulative and substantially covered by the instructions given to the jury. Therefore, the trial court did not abuse its discretion in failing to give the entire proposed instruction numbered one offered by the Petitioner.

## C. Motion to Suppress

The next assigned error concerns whether the trial court erred in denying the Petitioner's motion to suppress.[7] The Petitioner argued that the initial stop of the vehicle was unlawful[8] and pretextual, and that the police lacked probable cause to search the vehicle. The

---

[7]The Petitioner sought to suppress all the items seized as a result of the search of the vehicle the Petitioner was operating.

[8]We note that even though the Petitioner assigned as error that the initial stop was "unlawful," the Petitioner failed to develop this aspect of the assigned error. The Petitioner states that he "was stopped on a pretext for offenses not committed in the trooper's presence[,]" and "the initial stop of the vehicle was a mere pretext and was purportedly based solely on Captain Woodyard's observation of very minor traffic violations." The Petitioner does not elaborate on either statement with any law. Further, the Petitioner fails to address

(continued...)

13

trial court denied the motion, finding that there was reasonable suspicion to stop the vehicle

and there was a reasonable delay for the drug-sniffing dog to arrive. The trial court also found

that once the dog detected the presence of drugs, there was probable cause to search it. The

Petitioner argues that the canine sniff constituted a search in and of itself that had to be

---

[8](...continued)
or refute in his reply brief the Respondent's argument that the

> Petitioner, however, does not challenge the lawfulness of the initial stop, but argues on appeal that the actions of the subsequent dog sniff constituted a search for which there was no probable cause, and that law enforcement is not automatically entitled to delay a traffic stop for the purpose of bringing a dog to the traffic stop.

Finally, the Petitioner was willing to concede during oral argument that there was a lawful stop based upon a reasonable articulable suspicion. *See* Syl. Pt 1, in part, *State v. Stuart*, 192 W. Va. 428, 452 S.E.2d 886 (1994) ("Police officers may stop a vehicle to investigate if they have an articulable reasonable suspicion that the vehicle is subject to seizure or a person in the vehicle has committed, is committing, or is about to commit a crime.").

The alleged unlawfulness of the initial stop therefore was neither discussed with any specificity nor supported with any particular legal authority to substantiate the Petitioner's claim. As this Court has consistently held, "[a]lthough we liberally construe briefs in determining issues presented for review, issues which are . . . mentioned only in passing but are not supported with pertinent authority [ ] are not considered on appeal." *State v. LaRock*, 196 W. Va. 294, 302, 470 S.E.2d 613, 621 (1996). *See also Sale ex rel. Sale v. Goldman*, 208 W. Va. 186, 199-200 n. 22, 539 S.E.2d 446, 459-60 n. 22 (2000) (deeming assignment of error that "is terse and lacks any authority to support it" to have been waived); *Tiernan v. Charleston Area Med. Ctr., Inc.*, 203 W. Va. 135, 140 n. 10, 506 S.E.2d 578, 583 n. 10 (1998) ("Issues not raised on appeal or merely mentioned in passing are deemed waived." (citation omitted)); *State v. Lilly*, 194 W. Va. 595, 605 n. 16, 461 S.E.2d 101, 111 n. 16 (1995) ("[C]asual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal." (internal quotations and citation omitted)); Syl. Pt. 6, *Addair v. Bryant*, 168 W. Va. 306, 284 S.E.2d 374 (1981) ("Assignments of error that are not argued in the briefs on appeal may be deemed by this Court to be waived.").

supported by probable cause. The Respondent maintains that the trial court properly found

probable cause existed to search the inside of the vehicle once dog indicated the presence of

drugs on the passenger-side door.

The standard for review on a motion to suppress is set forth in syllabus points

one and two of *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996) as follows:

> When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error.

> In contrast to a review of the circuit court's factual findings, the ultimate determination as to whether a search or seizure was reasonable under the Fourth Amendment to the United States Constitution and Section 6 of Article III of the West Virginia Constitution is a question of law that is reviewed *de novo*. Similarly, an appellate court reviews *de novo* whether a search warrant was too broad. Thus, a circuit court's denial of a motion to suppress evidence will be affirmed unless it is unsupported by substantial evidence, based on an erroneous interpretation of the law, or based on the entire record, it is clear that a mistake has been made.

The focus of the issue before the Court is whether the use of a drug-sniffing dog

constituted a search that must be supported by probable cause. We have not previously

addressed the use of drug-sniffing dogs in the context of a lawful traffic stop. The United

15

States Supreme Court, however, considered this issue in *Illinois v. Caballes*, 543 U.S. 405 (2005).[9] In *Caballes*, a state trooper stopped the defendant for speeding. A second trooper also responded to the stop with a drug-sniffing dog. While the first trooper wrote the warning ticket, the second trooper walked around the car with the dog. The dog alerted the officers to the presence of drugs in the trunk of the car. The troopers searched the truck, found marijuana and arrested the defendant. The entire incident lasted less than ten minutes. The defendant was convicted of a narcotics offense. *Id*. at 406-07. On appeal to the Illinois Supreme Court, that court reversed, concluding that because the dog sniff occurred "without any 'specific and articulable facts' to suggest drug activity, the use of the dog 'unjustifiably enlarg[ed] the scope of a routine traffic stop into a drug investigation.'" *Id*. at 407 (quoting, in part, *People v. Caballes*, 802 N.E.2d 202, 205 (Ill. 2003)). The case was then appealed to the United States Supreme Court.

The Supreme Court, in *Caballes*, framed the issue before it as "'[w]hether the Fourth Amendment[10] requires reasonable, articulable suspicion to justify using a drug-

[9]This Court did cite to *Caballes* favorably in *State v. Rogers*, No. 13-0496, 2014 WL 2683047, at *5(W. Va. Supreme Court, June 13, 2014) (memorandum decision)(finding that "[o]nce dog alerted to drugs in the vehicle, this gave the police probable cause to believe that there were in fact drugs.").

[10]*Accord* article III, section 6 of the West Virginia Constitution ("The rights of the citizens to be secure in their houses, persons, papers and effects, against unreasonable searches and seizures, shall not be violated. No warrant shall issue except upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, or
(continued...)

16

detection dog to sniff a vehicle during a legitimate traffic stop.'" *Id*. (footnote added). The United States Supreme Court determined that "[a] dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment."[11] *Id*. at 410; *see City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000) (recognizing that a canine sniff of an automobile is not a search); *see also United States v. Place*, 462 U.S. 696, 706-07 (1983) (holding that a canine sniff of luggage does not constitute a search).

Other jurisdictions have adopted the law enunciated by the Supreme Court in *Caballes*. *See U. S. v. Branch,* 537 F.3d 328, 335-36 (4th Cir. 2008) ("A canine sniff is also constitutionally acceptable if performed within 'the time reasonably required' to issue a traffic citation. *Caballes*, 543 U.S. at 407, 410, 125 S. Ct. 834. This is because a dog sniff is not a search within the meaning of the Fourth Amendment, and it therefore requires no additional justification. *Id*. at 408-09, 125 S.Ct. 834; *see also United States v. Place*, 462 U.S. 696, 707,

---

[10](...continued)
the person or thing to be seized.").

[11]The Petitioner relies upon *Florida v. Jardines*, 133 S.Ct. 1409 (2013), which involved the use of a drug-sniffing dog on the front porch of a home to investigate an unverified tip that marijuana was being grown inside the home. In *Jardines*, the United States Supreme Court held that "[t]he government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment." *Id*. at 1417-18. Because the instant case is not predicated upon any argument that the police dog was being used to search a home or the immediate surroundings of the home, the holding in *Jardines* is not applicable to the facts of this case.

103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)"); *People v. Esparza*, 272 P.3d 367, 370-71 (Colo. 2012) ("In light of the Supreme Court's holding in *Caballes*, permitting a suspicionless dog sniff of a lawfully detained vehicle, and our own reconciliation of the federal and state constitutional provisions governing dog sniffs, the district court's suppression order no longer finds support in the provisions of the state constitution. Because the dog sniffs of the defendant's vehicle in these cases were neither a search cognizable under article II, section 7 of the Colorado Constitution [referring to the search and search provision] nor the fruit of an unlawful search or seizure, the district court's suppression order is reversed, and the case is remanded for further proceedings."); *Shelton v State*, 45 So.3d 1203,1209 (Miss. Ct. App. 2010) (stating that "'[e]ven without reasonable, articulable suspicion, the performance of a dog sniff of the outside of a vehicle by a trained canine during a routine, valid traffic stop is not a violation of one's Fourth Amendment rights against unreasonable searches and seizures.' *Jaramillo v. State,* 950 So.2d 1104, 1107 (Miss. Ct. App. 2007)."); *Haas v. State*, 172 S.W.3d 42, 51 (Tex. Ct. App. 2005) (relying upon *Caballes* in stating that "[e]ven in the absence of reasonable suspicion, a sniff of the outside of a vehicle by a trained canine during a routine, valid traffic stop is not a search within the meaning of the Fourth Amendment.").[12]

Like most other jurisdictions across the country, we now hold pursuant to the

---

[12]*But see People v. Devone*, 931 N.E.2d 70, 74 (N.Y. 2010) (holding under the New York Constitution that "a canine sniff of the exterior of an automobile constitutes a search . . . .").

United States Supreme Court's decision in *Illinois v. Caballes*, 543 U.S. 405 (2005), as a general rule, a dog sniff of the outside of a vehicle during a lawful traffic stop is not a search within the meaning of the Fourth Amendment to the United States Constitution or article III, section 6 of the West Virginia Constitution. Consequently, the Petitioner's argument that the use of a drug-sniffing dog constituted a search in and of itself that had to be supported by probable cause is without merit. The use of the drug-sniffing dog on the outside of the vehicle during the lawful[13] traffic stop was not a search requiring probable cause to effectuate.

Because the trial court determined that there was a "reasonable delay to obtain the narcotic sniffing dog[,]" and in light of the recent decision of the United States Supreme Court in *United States v. Rodriguez*, 135 S.Ct. 1609 (2015), we find it necessary to resolve the issue of whether a law enforcement officer is entitled to delay a traffic stop in order to bring in a drug-sniffing dog to sniff the outside of the vehicle. In *Caballes*, the Supreme Court indicated that a traffic stop "that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id*. at 407.

The United States Court of Appeals for the Fourth Circuit in *Branch* discussed the time reasonably required for a routine traffic stop in terms that "[t]he maximum acceptable

---

[13]*See supra* note eight.

19

length of a routine traffic stop cannot be stated with mathematical precision. Instead, the appropriate constitutional inquiry is whether the detention lasted longer than necessary, given its purpose." 537 F.3d at 335. As the Fourth Circuit noted:

> Observing a traffic violation provides sufficient justification for a police officer *to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop. See, e.g., Caballes*, 543 U.S. at 407, 125 S.Ct. 834; *Whren [ v. United States]*, 517 U.S. [806] at 810, 116 S.Ct. 1769 [(1996)]; *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004). Thus, pursuant to such a stop, a police officer may "request a driver's license and vehicle registration, run a computer check, and issue a citation." *Foreman*, 369 F.3d at 781.

*Branch*, 537 F.3d at 335-36 (emphasis added). Further, "[t]he officer may also, 'in the interest of personal safety,' request that the passengers in the vehicle provide identification, at least so long as the request does not prolong the seizure. *United States v. Soriano-Jarquin*, 492 F.3d 495, 500-01 (4th Cir. 2007)." *United States v. Vaughan*, 700 F.3d 705, 710 (4th Cir. 2012). The officer also may "'as a matter of course order the driver[14] of a lawfully stopped car to exit his vehicle.'" *Id.* (quoting *Maryland v. Wilson*, 519 U.S. at 410 (citing *Pennslyvania v. Mimms*, 434 U.S. 1906 (1977)(per curiam)) (footnote added).

On the day the case sub judice was argued before this Court, the United States Supreme Court issued its decision in *Rodriguez,* wherein it revisited *Caballes* and the

---

[14]Because the justification for having the driver exit a vehicle is grounded in officer safety, it extends to passengers. *See Wilson*, 519 U.S. at 414-15.

reasonableness of prolonging a lawful traffic stop in order to conduct a dog-sniff of a vehicle. In *Rodriguez*, a K-9 officer stopped the defendant and his passenger for driving on a highway shoulder, which was a violation of Nebraska law. *Rodriguez*, 135 S.Ct. at 1612. The officer asked for the defendant's license, registration, and proof of insurance. The officer also completed a records check on the passenger and called for a second officer. The officer wrote the defendant a warning. He then gave the warning to the defendant, explained it to him, and returned the documents to the defendant and his passenger. *Id.* at 1613.

Despite the completion of issuing the warning, the officer did not consider the defendant free to leave. After giving the warning to the defendant, the officer asked the defendant if he could walk his dog around the defendant's vehicle. The defendant said no and then the officer instructed the defendant to turn off the ignition to his truck, exit the truck and stand in front of the officer's car while he waited for the second officer. *Id.* The second officer arrived and took his dog and walked around the truck two times. During the second pass, the dog alerted the officers to the presence of drugs. A search of the vehicle revealed a large bag of meth. *Id.*

The defendant in *Rodriguez* was indicted on federal charges. He moved to suppress the evidence seized on the ground that the officer had prolonged the traffic stop without reasonable suspicion in order to conduct the drug sniff. *Id.* The Magistrate Judge,

21

District Court and the United States Court of Appeals for Eighth Circuit upheld the search and denied the motion to suppress, determining that "the extension of the stop by 'seven to eight minutes' for the dog sniff was only 'a *de minimis* intrusion'" of the defendant's personal liberty. *Id*. (quoting, in part, *U. S. v. Rodriguez*, 741 F.3d 905, 907 (8ᵗʰ Cir. 2014)).

The United States Supreme Court granted certiorari "to resolve a division among lower courts on the question whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff." *Rodriguez*, 135 S.Ct. at 1614. Relying, in part, on its prior decision in *Caballes*, the Supreme Court found that "[i]f an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.' As we said in *Caballes* and reiterate today, a traffic stop 'prolonged beyond' that point is 'unlawful.'" *Id*. at 1616 (quoting, in part, *Caballes*, 543 U. S. at 407). Thus, the Supreme Court framed the "critical" question as "not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs' – i.e., adds time to – 'the stop[.]'" *Id*. The Supreme Court vacated the judgment of the Eighth Circuit and remanded the case for further proceedings consistent with the opinion in light of the fact that the Eighth Circuit had left unresolved the issue of "whether reasonable suspicion of criminal activity justified detaining Rodriguez beyond completion of the traffic infraction investigation[.]" *Id.* at 1616-17.

22

Therefore, following the law established by the United States Supreme Court in *United States v. Rodriguez*, 135 S.Ct. 1609 (2015), and *Illinois v. Caballes*, 543 U.S. 405 (2005), a police officer may not extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff of the outside of a vehicle. As the Supreme Court opined "[i]f an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.'" *Id*. (quoting, in part, *Caballes*, 543 U.S. at 407).

In examining the facts now before us we are led to the inevitable conclusion that the state trooper conducting the lawful traffic stop of the Petitioner's vehicle did not unreasonably extend that stop beyond its completion in order to conduct a dog-sniff of the outside of the vehicle. Rather, a review of the evidence submitted at the suppression hearing in this case, including the videotape of the traffic stop, establishes that the lawful stop for suspicion of impaired driving was never completed due to the Petitioner's nervousness and being fidgety, in addition to the Petitioner's inability to provide an identification, all of which culminated in the Petitioner being asked to exit his vehicle. This series of events caused the trooper to inquire as to whether there was anything illegal in the vehicle and the trooper requesting a canine unit. The dog then alerted the officers to the presence of drugs on the

23

passenger side of the vehicle.[15]  Because the evidence fails to show that the mission of the

lawful traffic stop was completed at the time the dog sniff of the vehicle occurred,[16] we find

that there was no violation of the Petitioner's rights against unreasonable searches and seizure;

the trial court properly denied the motion to suppress the evidence seized from the vehicle.

## D.  Sufficiency of the Evidence

The Petitioner next argues that there was insufficient evidence introduced at trial

to sustain his conviction.[17]  Specifically, the Petitioner posits that this case is similar to that

of *State v. Cummings*, 220 W. Va. 433, 647 S.E.2d 869 (2007), in which the Court found that

there was a lack of evidence introduced to prove that the defendant had constructive

---

[15]Even though the length of the detention does not answer the inquiry of whether it was reasonable under the *Caballes* and *Rodriguez* standard, this whole series of events transpired in under thirteen minutes.

[16]Due to the fact that the mission of the lawful traffic stop was not completed at the time of the dog sniff, we agree with the circuit court's determination that there was no unreasonable delay in obtaining the canine unit.

[17]In order to be convicted of operating or attempting to operate a clandestine drug lab, the jury had to find beyond a reasonable doubt that the Petitioner did unlawfully, intentionally and feloniously operate or attempt to operate a clandestine drug laboratory by assembling chemicals and/or equipment for the purpose of manufacturing methamphetamine, a schedule II non-narcotic controlled substance. *See* W. Va. Code § 60A-4-411.  Likewise, to be convicted of conspiracy, the jury had to find that the Petitioner did unlawfully and intentionally conspire with his co-defendant, Terry Abbott, to commit the offense of operating or attempting to operate a clandestine drug laboratory and that one or both of the two co-defendants committed some overt act in furtherance of the conspiracy. *See Burd*, 187 W. Va. at 415, 419 S.E.2d at 676, Syl. Pt. 3.

possession of chemicals to be used for the production of the meth or that the defendant exercised control over the chemicals. Conversely, the Respondent maintains that there was sufficient evidence to support the Petitioner's conviction.

We use the following standard of review in challenges to the sufficiency of the evidence to support a conviction:

> The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Syl. Pt. 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995). Further, we have held that:

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

25

*Id*. at 663, 461 S.E.2d at 169, Syl. Pt. 3.

While the Petitioner's relies upon the *Cummings* decision, that case is factually distinguishable from the instant matter. In *Cummings*, a police officer stopped a vehicle for speeding that the defendant was driving. The defendant was not the owner. Further, there were two passengers in the vehicle; one in the front and one in the back. While patting down the defendant for the officer's safety and finding two bags of what appeared to be methamphetamine and three hydrocodone pills, the officer also noticed six boxes of cold medicine containing pseudoephedrine in a yellow Dollar General bag sitting on the rear floorboard of the car directly behind the driver's seat. Upon a further search of the car, the officer found a white bag containing six boxes of matches, each box containing fifty individual match packets, and two bags of ten syringes each on the rear floorboard behind the passenger seat. 220 W. Va. at 436-37, 647 S.E.2d at 872-73. The defendant was charged and convicted of attempting to operate a clandestine drug lab and conspiracy to operate a clandestine drug lab. *Id*. at 437, 647 S.E.2d at 873.

On appeal, the Court reversed both convictions. The Court's reversal was based upon the insufficiency of the evidence introduced by the State to support its theory that the defendant, as the driver of the vehicle, was in constructive possession of the cold medicine and matches. *Id*. at 440, 647 S.E.2d at 876. In resolving the issue, the Court held in syllabus

26

point six:

> In order to sustain a conviction for violation of W. Va. Code § 60A-4-411 (2003), by assembling any chemicals or equipment for the purpose of manufacturing methamphetamine, the State must prove beyond a reasonable doubt that the defendant had actual or constructive possession over the chemicals and/or equipment. In order to establish constructive possession where the defendant is present in a vehicle wherein such materials are found, the State must prove beyond a reasonable doubt that the defendant had knowledge of the presence of the chemicals and/or equipment to be used for the purposes of manufacturing methamphetamine and that such items were subject to the defendant's dominion and control.

*Id*. at 435, 647 S.E.2d at 871, Syl. Pt. 6.

In *Cummings*, the Court found that the there was no forensic evidence, such as fingerprints, on the cold medicine or matches, no evidence that defendant had purchased items, and no evidence that the defendant was aware that the items were in the car. *Id*. at 440-41, 647 S.E.2d at 876-77. Thus, the Court determined that "[t]here was simply no evidence to support an inference or actual or constructive possession. Absent a finding of actual or constructive possession, a finding that the Appellant was assembling the materials for the purpose of manufacturing methamphetamine is therefore not plausible." *Id*. at 441, 647 S.E.2d at 877.

In the instant case, unlike the facts in *Cummings,* the evidence offered at trial showed that a canine unit alerted the officers to the presence of drugs on the front passenger's

side of a car in which the Petitioner was driving and his co-defendant was a passenger. Inside the vehicle, the state trooper, who was trained in handling methamphetamine, observed what he termed as a "young pop clandestine laboratory or shake and bake." The trooper testified that he detected not only a chemical odor indicative of a meth lab, but also he observed a vapor or cloud emitting from a bag. Additionally, Alisha Neal, a forensic chemist with the West Virginia State Police Forensic Laboratory, testified that some of the items submitted to the lab tested positive for methamphetamine. The discovery of an active meth lab emitting both vapor and a chemical odor in the front seat of the car where both the Petitioner and co-defendant were is much different that than ingredients being located in a bag in the back seat of the car. *See Cummings*, 220 W. Va. at 440-41, 647 S.E.2d at 876-77. We find that the evidence was sufficient beyond a reasonable doubt for the jury to find that the Petitioner "had knowledge of the presence of the chemicals and/or equipment to be used for the purposes of manufacturing methamphetamine and that such items were subject to the defendant's dominion and control." *Id.* at 435, 647 S.E.2d at 871, Syl. Pt. 6. The evidence also supports the conclusion that the Petitioner conspired with his co-defendant to produce the meth. Consequently, no error was committed by the trial court regarding this issue.[18]

---

[18]We summarily reject the Petitioner's argument that the trial court erred in allowing Officer Sturm of the Parkersburg Police Department to testify regarding the shake and bake method of making meth. The Petitioner contends that the testimony was irrelevant and was more prejudicial than probative. "A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are reviewed for an abuse of discretion." *State v. Blake*, 197 W. Va. 700, 705, 478 S.E.2d 550, 555 (1996) (citation omitted). The officer's testimony regarding
(continued...)

28

## IV. Conclusion

Based upon the foregoing, we affirm the trial court's decision.

Affirmed.

---

[18](...continued)
the processes used in the shake and bake method, as well as the state of the clandestine lab found by the state trooper met the relevancy threshold under Rule 401 of the West Virginia Rules of Evidence as the evidence had the "tendency to make a fact more . . . probable than it would be without the evidence; and []the fact is of consequence in determining the action." Further, the probative value of the testimony was not "substantially outweighed" by any danger of "unfair prejudice" to the Petitioner. W. Va. R. Evid. 403. Consequently, the trial court did not abuse its discretion in allowing Officer Sturm's testimony.